UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CLAYTON C.,                                  )
                                             )
                    Plaintiff,               )
                                             )
            v.                               )        No. 1:19-cv-02140-TAB-JMS
                                             )
ANDREW M. SAUL, Commissioner of the Social   )
Security Administration,                     )
                                             )
                    Defendant.               )

**ORDER ON PLAINTIFF'S BRIEF IN SUPPORT OF COMPLAINT**

**I.      Introduction**

Plaintiff seeks judicial review of the Social Security Administration's decision denying

his applications for disability insurance benefits and supplemental security income.  Plaintiff has

a complicated claim for benefits involving both mental and physical impairments that raises a

host of errors on appeal and includes significant issues with drug abuse and addiction.  For the

reasons detailed below, the Court affirms in part, and remands in part, the ALJ's decision.

**II.     Background**

In September 2013, Plaintiff filed for disability insurance benefits, alleging a disability

onset date of August 1, 2013.  His application was denied initially and upon reconsideration.

Upon request, a hearing was held before an ALJ, who denied his claim.  The Appeals Council

denied review and Plaintiff sought judicial review.  Upon joint motion, the District Court

remanded the case to the SSA for a new hearing.  In 2017, during the pendency of the appeal,

Plaintiff filed new applications for supplemental security income and disability insurance

benefits.  Following the district court remand, the Appeals Council consolidated the 2013

application with the 2017 applications.  A different ALJ conducted the second hearing and issued

a new decision—under review here—finding that Plaintiff was not disabled.  The ALJ found:

> The claimant has the following severe impairments: history of HIV, although
> stable in recent years; peripheral neuropathy predominantly affecting the lower
> extremities; neck pain with multilevel cervical spine spondylosis and low back
> pain with lumbar spine degenerative changes [with] stenosis; history of bipolar
> disorder, anxiety/simple phobia and depression, as well as reported PTSD and
> OCD, and a condition of fear of vomiting; history of opioid dependence; chronic
> polysubstance abuse drug abuse, including use of methamphetamine.

[Filing No. 7-25, at ECF p. 8 (citations omitted).]  The ALJ found Plaintiff's RFC to be limited

as follows:

> After careful consideration of the entire record, the undersigned finds that, based
> on all of the impairments, including the substance use disorders, the claimant has
> the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except he is limited to only occasional climbing of
> ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; never
> climbing ladders, ropes, or scaffolds.  Mentally, he is limited to understanding,
> carrying out and remembering simple instructions consistent with unskilled work,
> defined as occupations that can be fully learned within a short period of time of
> no more than 30 days and require little or no judgment to perform simple tasks,
> with the ability to sustain those tasks throughout the eight-hour workday without
> frequent redirection to task; no sudden or unpredictable workplace changes in
> terms of use of work tools, work processes, or work settings and if there are
> workplace changes, they are introduced gradually; cannot perform tasks requiring
> intense focused attention for more than two hours continuously, but can maintain
> attention/concentration for two hour segments of time; work that does not require
> satisfaction of strict or rigid production quotas or does not involve assembly line
> pace work; only brief and superficial interactions with supervisors, co-workers,
> and the general public, defined as occasional and casual contact with no
> prolonged conversations and contact with supervisors is short but allows the
> supervisors to give instructions; and no exposure to intense or critical supervision.
> However, due to ongoing and seemingly chronic drug usage, the claimant cannot
> maintain competitive work attendance due to episodes of chronic psychosis due in
> large part to his drug usage.

[Filing No. 7-25, at ECF p. 13.]  Applying the remainder of the five-step sequential evaluation

process, the ALJ determined that Plaintiff was disabled when the functional effects of his drug

usage were included.  The ALJ then determined that if Plaintiff stopped using drugs he would

have the RFC quoted above except that the final limitation that he would be unable to maintain competitive work attendance would no longer be applicable.  The ALJ again applied the remainder of the sequential evaluation process with the modified RFC.  With the assistance of a vocational expert, the ALJ found that Plaintiff was unable to return to his past relevant work as a care coordinator and social worker.  However, the VE testified based on a consideration of Plaintiff's age, education, work experience, and modified RFC, that he retained the ability to perform other light exertion jobs that existed in significant numbers in the national economy, including representative occupations such as a hand packager, mail sorter, and office helper. This suit followed.

III.    **Discussion**

    **A.  Methamphetamine Usage**

A pervasive consideration underlying the ALJ's analysis was his conclusion that Plaintiff's drug usage, specifically use of methamphetamine, was "ongoing and seemingly chronic."  [Filing No. 7-25, at ECF p. 13.]  During the period under review, a treating physician diagnosed Plaintiff with episodic methamphetamine dependence.  [Filing No. 7-38, at ECF p. 3.] The ALJ detailed a series of hospital admissions—beginning in 2017 and continuing in 2018— involving admitted methamphetamine use when the Plaintiff displayed or reported psychotic symptoms, auditory and visual hallucinations, paranoid delusions, and impaired thought content, thought process, and cognition.  [Filing No. 7-25, at ECF p. 29.]  The ALJ concluded that Plaintiff's "symptoms appear[ed] to be present and increase corresponding to his meth use." [Filing No. 7-25, at ECF p. 29.]  As a result, the ALJ ultimately concluded that Plaintiff's "substance use disorder is a contributing factor material to the determination of disability

because the claimant would not be disabled if he stopped the substance use." [Filing No. 7-25, at ECF p. 31 (citations omitted).]

The Social Security Act specifies that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(c). The Seventh Circuit has explained that "[t]o determine whether alcoholism or drug addiction is a contributing factor material to a determination of disability, the Social Security Administration considers whether the claimant would be found to be disabled if his alcohol or drug use stopped." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999) (citing 20 C.F.R. §§ 404.1535, 416.935). "Evidence of improvement, including positive evaluations during a period of abstinence, is the 'best evidence' that a claimant's drug or alcohol addiction is material." *Barrett v. Berryhill*, 904 F.3d 1029, 1032 (7th Cir. 2018) (quoting SSR 13-2p (S.S.A. Feb. 20, 2013), 2013 WL 621536, at *8).

Plaintiff contends that the ALJ's conclusion was not supported by substantial evidence that Plaintiff's methamphetamine dependence was material to his disability. [Filing No. 11, at ECF p. 27.] He does not contest that he "first relapsed in July 2017 when he was suicidal, but there is no evidence to support the ALJ's conclusion that [Plaintiff's] drug use was ongoing and chronic." [Filing No. 11, at ECF p. 27.] There was abundant evidence that Plaintiff had multiple relapses with methamphetamine use beginning in at least 2017. On July 27, 2017, he reported to a treating provider in a hospital that he used methamphetamine because of suicidal ideation. [Filing No. 7-38, at ECF p. 2.] Rather than being admitted, Plaintiff was cleared by psychiatry after a crisis assessment determined he was a low risk to harm himself because his symptoms were precipitated by taking "significant methamphetamine." [Filing No. 7-38, at ECF p. 13.]

4

On September 18, 2017, he voluntarily admitted himself reporting paranoia, suicidal ideation, and ongoing use of methamphetamine—including intravenous use—since a relapse about a month earlier with only one to two-day breaks.  [Filing No. 7-39, at ECF p. 38.]  On April 18, 2018, Plaintiff began treatment with a new provider of Suboxone—which he had taken since 2011—and detailed his history of substance usage.  [Filing No. 7-40, at ECF p. 64.]  He reported a history of opiate addiction—at one time using twenty Norco a day from eight different pharmacies—a history of snorting heroin, an eight-year period of sobriety from opiates, "but [he had] continued meth use."  [Filing No. 7-40, at ECF p. 64.]  Methamphetamine usage was described as from 2007 through current with the last use reportedly the day before after approximately six months without.  [Filing No. 7-40, at ECF p. 64.]  Ongoing weekly drug testing as a condition of Plaintiff's Suboxone management with the new provider revealed that he tested positive for methamphetamine on June 27, 2018, July 30, 2018, and August 6, 2018. [Filing No. 7-40, at ECF p. 74.]  Plaintiff left his latest hospitalization against medical advice and was not willing to participate in intensive outpatient treatment for his methamphetamine dependence both because he was unwilling to detox from the large amount of daily Xanax he was being prescribed.  [Filing No. 7-48, at ECF p. 2.]  The evidence is unequivocal that Plaintiff's use of methamphetamine was ongoing and seemingly chronic beginning in 2017.

The crux of Plaintiff's argument is that there was not substantial evidence to conclude that his methamphetamine usage was ongoing before he contends that he first relapsed in 2017. Relevant to a determination of the materiality of his drug addiction, Plaintiff contends that the record established a considerable period of abstinence during a portion of the period under review spanning from before the alleged onset date, August 1, 2013, through the July 2017 relapse.  The ALJ noted that Plaintiff's treating licensed mental health counselor, Norman

Brandenstein, had reported in October 2017 that Plaintiff's sobriety was currently maintained, but the evidence of record showed that Plaintiff had used methamphetamine less than a month before as detailed above. [Filing No. 7-25, at ECF p. 18-19.] The ALJ also noted that Plaintiff's treating psychiatrist, Michael Webber, M.D., stated in October 2013 that Plaintiff's methamphetamine abuse was in remission. Brandenstein also stated in September 2015 that Plaintiff's sobriety was maintained. The ALJ concluded that these provider statements did "not appear to be true according to the updated medical records." [Filing No. 7-25, at ECF p. 19.] Plaintiff contends that it was "harmful error for the ALJ to use evidence from 2017 to discredit evidence from 2013 and 2015." [Filing No. 11, at ECF p. 27.]

However, the Court does not find error. The Supreme Court has explained that "[t]he phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *T-Mobile South, LLC v. Roswell*, 135 S. Ct. 808, 815 (2015)). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (additional citation omitted)). The Seventh Circuit has recognized that "challenges to the sufficiency of the evidence rarely succeed" under this standard. *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

The Court need not resolve the question of whether it would be reasonable to conclude from a record documenting frequent relapses in 2017 and 2018 that the Plaintiff's reported abstinence in the years immediately before was suspect. There is more direct evidence that Plaintiff did not first relapse in 2017. During the hearing, after Plaintiff admitted

methamphetamine use as recently as in August 2018, the ALJ asked him if that happened often. Plaintiff testified, "It did for a while.  Off and on.  I have had periods of sobriety and use, long periods over the past several years.  I think the longest period I went was August 2011 to sometime in 2014.  I mean it was quite a long period of time."  [Filing No. 7-26, at ECF p. 40.] Plaintiff's counsel noted during the hearing that Plaintiff had been a "great historian" for the years that she had known him.  [Filing No. 7-26, at ECF p. 57.]  Thus, Plaintiff's own testimony indicated that he was not continuously abstinent until 2017.

Plaintiff contends that the ALJ failed to address evidence that he was regularly drug tested as a condition of his Suboxone treatment.  [Filing No. 11, at ECF p. 27.]  The Seventh Circuit has repeatedly held that "[t]he ALJ must confront the evidence that does not support [his] conclusion and explain why that evidence was rejected."  *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (collecting cases)).  To whatever degree the ALJ's failure to explicitly confront this evidence could be considered error, the error is harmless.  When Plaintiff was receiving Suboxone treatment from his initial provider, he was ordered to provide urine screens at monthly scheduled appointments, but he was not tested at each visit for a portion of the treatment period.  [*See* Filing No. 7-9, at ECF p. 3-35 (visit dates illegible because of a copying issue but urine screens were not ordered at every visit); *see also* Filing No. 7-16 at 37-42 (monthly visits, not always tested); Filing No. 7-22 at 3-50 (same, except testing eventually became more regularly administered during the monthly visits).]  Considering the limited amount of time that methamphetamine is detectable in a urine screen, use could have been planned around the monthly visits to avoid detection.  For example, Plaintiff testified that his longest period of abstinence ended sometime in 2014, but there is no indication—despite testing in 2014—that he failed a urine screen.

Accordingly, an attempt to construct a period of definitive abstinence from this record is an imperfect science. However, assuming Plaintiff's testimony was accurate that his longest period of abstinence from methamphetamine use was from August 2011 through sometime in 2014, the ALJ cited evidence from that period that Plaintiff's bipolar disorder and obsessive personality symptoms were controlled with treatment. [Filing No. 7-25, at ECF p. 17 (citing Filing No. 7-10, at ECF p. 22).] A mental condition that is treatable and under control is not a basis for disability benefits. *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006).

Moreover, the ALJ cited a statement by Plaintiff's sister that Plaintiff had been intelligent and able to graduate from college before all of his drug use started and that he was still able to adapt and function during visits with her, her husband, and their parents because he did not use drugs while doing so. [Filing No. 7-25, at ECF p. 29.] Agency guidance indicates that evidence may be collected from "other" non-medical sources including family members in a case involving drug and alcohol addiction. SSR 13-2P, 2013 WL 621536, at *11. The ruling explains:

> Information from "other" sources can describe a claimant's functioning over time and can also be especially helpful in documenting the severity of [drug and alcohol addiction] because it supplements the medical evidence of record. "Other" source opinions can assist in our determination whether [drug and alcohol addiction] is material to a finding of disability because it can document how the well the claimant is performing activities of daily living in the presence of a comorbid impairment. In many cases, evidence from "other" sources may be the most important information in the case record for these documentation issues.

*Id*. On August 7, 2018, Plaintiff drove from his apartment in Indianapolis to his sister's house in Huntington during a psychotic episode involving paranoid delusions—that he was being followed by people trying to do him harm—that occurred after admitted methamphetamine use; he was admitted voluntarily for hospitalization after his sister brought him to the emergency

room.  [Filing No. 7-44, at ECF p. 5.]  Two days later, when Plaintiff wanted to leave against

medical advice, the provider contacted his sister and she detailed the following:

> She shared, "He's been a meth user for quite a while.  He was using for five days
> before he was admitted.  He's been doing different drugs for a long time.  Before
> he started all this he was so smart.  He graduated from Indiana University.  I'm
> there to support him and I always will but yea[h] I'm afraid for him.  I'm really
> afraid for him right now.  I don't know how to help him.  I don't know what I can
> do.  It's scary to me, it's frustrating to me and it's confusing to me."

> She stated, "He's really impatient when he's inpatient and he thinks it should be
> an overnight fix.  He doesn't want to be in there.  I don't understand why not."
> She expressed that she would come up to visit and try to convince him to rescind
> the AMA.

> She shared, "When he is up here in Huntington with my husband and I or my
> parents, he is not using and is level[-]headed but when he goes back to
> Indianapolis to his apartment he uses with his druggie friends."

[Filing No. 7-44, at ECF p. 18.]  The statement is substantial evidence that Plaintiff had an

ongoing and chronic issue with methamphetamine use but could avoid drug use when necessary

and was more level-headed and functional when he did.  The statement is also generally

supportive of the ALJ's conclusion that methamphetamine addiction was material to Plaintiff's

disability.

Plaintiff also contends that substantial evidence does not support the ALJ's conclusion

that Plaintiff's methamphetamine addiction was a but-for cause of his demonstrated issues with

maintaining competitive work attendance.  [Filing No. 11, at ECF p. 27.]  Plaintiff argues, in

part, that "[t]here is evidence of severe isolative behavior during periods of sobriety, even

avoiding parts of his apartment due to anxiety."  [Filing No. 11, at ECF p. 27.]  However, the

above statement of Plaintiff's sister provide a reasonable basis to conclude that attendance issues

were causally related to drug use and that those issues would not have been as frequent during

periods of abstinence.  Moreover, the statement casts doubt as to whether reports of paranoia

associated with Plaintiff's apartment were evidence of his functioning at a time when drugs were not being used.  In October 2014, Plaintiff reported phobias concerning his apartment and a feeling that an invader may be there, which got worse at night and in the dark.  [Filing No. 7-21, at ECF p. 19.]  The symptoms are similar to delusions that were reported during hospitalizations following admitted methamphetamine use.  Furthermore, it is not self-evident that these symptoms occurred during a period of sobriety considering Plaintiff's testimony that his longest period of abstinence from methamphetamine ended sometime in 2014.

Accordingly, for all the reasons explained above, the Court finds that substantial evidence supports the ALJ's conclusions that drug addiction was ongoing and seemingly chronic and that it was material to Plaintiff's disability because it was a but-for cause of Plaintiff's most severe psychotic symptoms that would have precluded competitive attendance.

### B.  Work Activity

Plaintiff contends that the ALJ's evaluation of Plaintiff's work activity was not supported by substantial evidence.  [Filing No. 11, at ECF p. 28.]  In particular, he asserts that the ALJ's decision did not account for the significant accommodations that Plaintiff received from his supervisor even though the ALJ gave significant weight to the supervisor's statements.  [Filing No. 11, at ECF p. 28-29.]

The ALJ discussed the two statements provided in January 2014 and October 2015 by Plaintiff's supervisor of his part-time work as a behavioral consultant for clients with developmental disabilities.  [Filing No. 7-25, at ECF p. 21.]  Consistent with SSR 06-03p (S.S.A. Aug. 9, 2006), 2006 WL 2329939, at *6, the ALJ considered the opinions of the non-medical source with knowledge in her professional capacity of Plaintiff's functional capabilities; the ALJ gave significant weight to her statements based on her familiarity with Plaintiff gleaned through

regular contact over a prolonged period of time.  [Filing No. 7-25, at ECF p. 22.]  Noting issues

with productivity, workload, concentration during meetings, and task completion, the ALJ

explained that the "functions the claimant performs in the capacity of behavioral consultant far

exceed the residual functional capacity in this decision.  It is understandable that he would

experience difficulty performing those duties.  However, this does not mean that the claimant is

disabled from all work activity."  [Filing No. 7-25, at ECF p. 21.]  The VE identified Plaintiff's

part-time work as a behavioral consultant as corresponding with a skilled job title as a

"developmentally disabled aide."  [Filing No. 7-26, at ECF p. 51.]  The ALJ explained found that

Plaintiff was unable to return to his similarly skilled past relevant work as a social worker

because he was limited to simple, repetitive work.  [Filing No. 7-25, at ECF p. 21-22.]

 The Court does not find any error with the ALJ's consideration of the supervisor's

opinions.  As the ALJ explained, the limitations described in the statements were incorporated

into Plaintiff's RFC.  [Filing No. 7-25, at ECF p. 22.]  The supervisor noted that Plaintiff's

workload had to be decreased to fewer clients because he could not regularly meet with them.

[Filing No. 7-7, at ECF p. 50.]  She indicated that Plaintiff was observed as being anxious and

uncomfortable in group settings and meeting new people, such that she decreased his obligation

to attend meetings.  [Filing No. 7-8, at ECF p. 28.]  She also indicated that he was unable to

concentrate for "long periods of time without frequent breaks."  [Filing No. 7-8, at ECF p. 29.]

However, she noted that Plaintiff had "no issues" with his ability to understand and carry out

short and simple instructions, get along with co-workers and supervisors, and accept instruction

and criticism from supervisors.  [Filing No. 7-7, at ECF p. 50-51.]  Those capabilities are in line

with the basic demands of all unskilled work.  *See* SSR 85-15 (S.S.A. Jan. 1, 1985), 1985 WL

56857, at *4 (describing the basic demands of unskilled work).  Furthermore, the ALJ's RFC

finding, detailed above, limited Plaintiff to simple tasks and instructions, only brief and superficial contact with others, and no intense focus on tasks exceeding two-hour segments.

As such, it is not relevant the level of difficulties that Plaintiff had performing a skilled occupation that predominantly involved intensive interaction with clients. Furthermore, as explained above, the ALJ did not find Plaintiff's issues with attendance to be credible if drug use were not factored into his functioning, nor was it feasible to conclude based on the record and timing of the statements that the difficulties with attendance reflected Plaintiff's functioning during a definitive period of abstinence as opposed to being effected by methamphetamine usage. *See Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (concluding that the ALJ need incorporate into the RFC/hypotheticals to the VE only the limitations that the ALJ finds credible).

### C.  Medical Opinions

Plaintiff contends that there is no logical bridge from the evidence to the ALJ's conclusion that several supportive treating opinions were deserving of great weight but did not address Plaintiff's functioning without drug use. [Filing No. 11, at ECF p. 30.] Plaintiff asserts that the current ALJ repeated a similar error as the past ALJ and did not follow the Appeals Council's remand order. [Filing No. 11, at ECF p. 31.] Plaintiff also contends that the ALJ's conclusion was not supported by substantial evidence that the opinion of the medical expert who responded to interrogatories after the initial hearing was consistent with the medical evidence. [Filing No. 11, at ECF p. 31.]

The Court does not find any error with the ALJ's evaluation of the opinion evidence. In September and October 2018, three of Plaintiff's treating providers: Dr. Webber, Brandenstein, and a treating nurse practitioner completed assessments that Plaintiff would be unable to meet

competitive standards or would have no useful ability to function—defined as "cannot perform

this activity on a regular, reliable and sustained scheduled in a regular work setting"—in a

number of vocationally relevant areas of mental functioning.  [Filing No. 7-40, at ECF p. 78-80;

Filing No. 7-41, at ECF p. 4-6; Filing No. 7-41, at ECF p. 9-11.]  Consistent with the ALJ's

finding that Plaintiff was disabled when drug usage was factored into his functioning, the ALJ

gave "great weight" to these treating opinions but explained further:

> However, these supportive statements with respect to the claimant's inability to
> work from a mental perspective do not seem to factor in the claimant's chronic
> drug usage, mainly meth, as evidenced in the record.  As discussed above, during
> this time, the claimant was abusing substances.  Therefore, the undersigned gives
> great weight to these opinions regarding the claimant's functioning, while he was
> abusing substances.

[Filing No. 7-25, at ECF p. 24-25.]  Despite the providers' long treatment histories with Plaintiff,

none of the opinions made any reference to Plaintiff's drug usage.  As detailed above, the

medical record included emergency care involving the use of methamphetamine in 2017 and

2018, as well as diagnosed methamphetamine dependence predating the supportive treating

opinions.  Also noted above, the ALJ detailed how the treating sources had provided other

statements of record suggesting ongoing sobriety despite evidence near in time to those

statements that established ongoing abuse of methamphetamine.  As such, it is impossible to

determine the extent of the providers' knowledge of Plaintiff's ongoing drug usage.  None of the

treating opinions was expressly addressing Plaintiff's ability to function if drug use were

stopped.  Accordingly, the ALJ did not err by giving weight to these statements when evaluating

Plaintiff's RFC when drug use was factored in but finding the statements irrelevant to the second

necessary evaluation of Plaintiff's RFC if drug use were stopped.

Plaintiff did not develop how the ALJ failed to follow the Appeals Council's remand

order.  Notably, none of the issues identified by the Appeals Council to be addressed on remand

expressly involved the treating opinions of record.  [*See* Filing No. 7-27, at ECF p. 80-83.]

Plaintiff did cite to a page range of the Appeals Council's order that appears to align with a

discussion that the previous ALJ's RFC finding limited Plaintiff to occasional contact with co-

workers and supervisors.  However, the ALJ did not explain why the more restrictive

assessments of the reviewing consultants that Plaintiff was limited to relating on a superficial

basis with co-workers and supervisors was not included in the RFC.  [Filing No. 11, at ECF p. 31

(citing Filing No. 7-27, at ECF p. 80-81).]  The current ALJ gave great weight to the reviewing

consultants' opinions.  [Filing No. 7-25, at ECF p. 22-23.]  Critically, the ALJ's RFC finding,

detailed above, adopted the limitations detailed in the consultants' narrative assessments,

including that Plaintiff was limited to relating on a superficial basis with co-workers and

supervisors.

      The Court also does not find error with the ALJ's evaluation of the opinion of the

medical expert.  After the initial hearing, on October 31, 2015, clinical psychologist James

Brooks, Ph.D., responded to interrogatories based on a review of the existing record and assessed

Plaintiff's mental functioning.  [Filing No. 7-24, at ECF p. 9-17.]  The ALJ explained that

although he gave "great weight to this opinion because it is consistent with treatment records that

Dr. Brooks has used in a persuasive rationale, greater weight has been assigned to the state

agency psychologists' opinions because they indicated that the claimant had a moderate

limitation in concentration, persistence, or pace."  [Filing No. 7-25, at ECF p. 23.]  The parties

dispute whether Dr. Brooks's review included the supervisor's statements about Plaintiff's work

activity.  Plaintiff also takes issue with Dr. Brooks's description of the record as not showing any

manic phases to support a diagnosis of bipolar disorder despite there being evidence the Plaintiff

contends shows "erratic behavior, dangerous behavior without concern for risk of harm, and deceased need for sleep." [Filing No. 11, at ECF p. 23.]

However, Plaintiff has not developed how he was harmed by the ALJ's evaluation of Dr. Brooks's opinion.  Reviewing courts give the ALJ's "opinion a commonsensical reading rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).  The record does not appear to include any medical source statement that attributed Plaintiff's behavior to a manic phase of his bipolar disorder.  Plaintiff testified to the contrary that his provider described that he had depressive episodes "and then instead of it spiking to a mania phases, I spiked down lower into a depressive phase." [Filing No. 7-26, at ECF p. 28.]  Regardless, the only limitation that Dr. Brooks assessed was that Plaintiff was limited to occasional contact with others.  [Filing No. 7-24, at ECF p. 16.]  Even though the ALJ ostensibly gave Dr. Brooks's opinion great weight, the ALJ assessed far greater mental limitations, including the more restrictive limitations with interaction described above, as well as other relevant limitations discussed in greater detail below.  There is no indication that Dr. Brooks's opinion was material to a denial of Plaintiff's claim.  The ALJ made clear that he depended to a greater degree on the reviewing psychological consultants' opinions to determine Plaintiff's mental RFC.

### D.  Moderate Limitations

Plaintiff contends that the ALJ's Step Five determination was not supported by substantial evidence.  Plaintiff's specific argument, however, is difficult to pick out from the following argument Plaintiff makes:

> The ALJ limited Mr. Carl to "short" contact with supervisors that "allows the supervisors to give instructions" and "no exposure to intense or critical supervision."  This restriction is to accommodate what the ALJ deemed to be moderate limitations in interacting with others; moderate limitations in concentration, persistence, and pace; and marked limitations in adapting/managing himself.  The Seventh Circuit has rejected the view that

> "limiting someone to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace."

[Filing No. 11, at ECF p. 33 (quoting in the last sentence *Yurt v. Colvin,* 758 F.3d 850, 858-59 (7th Cir. 2014)) (other citations omitted).]  The limitation described by Plaintiff was not the extent of the ALJ's RFC finding concerning Plaintiff's mental health functioning.  As detailed above, the ALJ found other relevant limitations.  Moreover, the ALJ specifically found that Plaintiff was disabled if the functional effects of marked limitations with adapting and managing himself primarily from drug usage were considered.  The relevant RFC finding under review if drug usage were stopped corresponds with the ALJ's listing assessment that Plaintiff would have no more than moderate limitations in any of the four functional domains.  [*See* Filing No. 7-25, at ECF p. 26-27.]

Based on Plaintiff's citation to *Yurt*, the Court presumes that Plaintiff meant to invoke the oft-raised argument that the ALJ's mental RFC finding did not adequately account for the moderate limitations in mental health functioning the ALJ found supported by the record when assessing whether Plaintiff met a listing.  Regardless of the basis, a hypothetical question posed by the ALJ to the VE "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record."  *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Indoranto,* 374 F.3d at 473-74 (7th Cir. 2004) ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record.").  "Among the mental limitations that the VE must consider are deficiencies of concentration, persistence, or pace." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (citing *Yurt,* 758 F.3d at 857; *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)).  "Although it is not necessary that the ALJ use the

precise terminology of 'concentration,' 'persistence,' or 'pace,' we will not assume that a VE is apprised of such limitations unless he or she has independently reviewed the medical record." *Id*. at 814 (citing Yurt, 758 F.3d at 857).

According to the Seventh Circuit precedent in *Burmester v. Berryhill*, 920 F.3d 507, 511-12 (7th Cir. 2019), the Court does not find error here because the ALJ adopted the narrative limitations assessed by the reviewing consultant psychologists and the checkbox portion of their worksheet assessments did not indicate other areas of limitation that were not adequately accounted for in the narrative portion.  The initial and reconsideration reviews of Plaintiff's 2015 application resulted in verbatim consultants' assessments that:

> To the extent his/her physical condition permits and with continued [abstinence] from substances, the evidence suggests that claimant can understand, remember, and carry-out unskilled to semi-skilled tasks.  The claimant can relate on a superficial basis on an ongoing basis with co-workers and supervisors.  The claimant can attend to task for sufficient periods of time to complete tasks.  The claimant can manage the stresses involved with work.

[Filing No. 7-4, at ECF p. 12; Filing No. 7-4, at ECF p. 28.]  Following Plaintiff's 2017 applications, the record was reviewed by Amy S. Johnson, Ph.D., on December 18, 2017, and she provided the following narrative assessment:

> Claimant has the mental capacity to understand, remember, and follow simple instructions.  [Plaintiff] is restricted to work that involves brief, superficial interactions [with] fellow workers, supervisors and the public.  Within these parameters and in the context of performing simple, routine, repetitive, concrete, tangible tasks, [plaintiff] is able to sustain attention and concentration skills to carry out work like tasks with reasonable pace and persistence.

[Filing No. 7-27, at ECF p. 64.]  The ALJ's RFC finding, detailed above, included all the limitations expressed in the collective narratives of the reviewing consultants.

Furthermore, Dr. Johnson's worksheet assessment—consistent with her narrative—found Plaintiff to be moderately limited with his ability to: (1) carry out detailed instructions, (2)

maintain attention and concentration for extended periods, (3) interact appropriately with the general public, (4) accept instructions and respond appropriately to criticism from supervisors, (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (6) respond appropriately to changes in the work setting.  [Filing No. 7-27, at ECF p. 62-63.] Dr. Johnson found that Plaintiff would not be significantly limited in all the other assessed areas of mental functioning, including, notably, his ability to: (1) carry out very short and simple instructions, (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (3) sustain an ordinary routine without special supervision, (4) work in coordination with or in proximity to others without being distracted by them, (5) make simple work-related decisions, (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (7) ask simple questions or request assistance.  [Filing No. 7-27, at ECF p. 62-63.]  The ALJ's modified RFC finding is consistent with the detailed assessment of limitations found by Dr. Johnson in the worksheet.

Again, the ALJ found:

> Mentally, [Plaintiff] is limited to understanding, carrying out and remembering simple instructions consistent with unskilled work, defined as occupations that can be fully learned within a short period of time of no more than 30 days and require little or no judgment to perform simple tasks, with the ability to sustain those tasks throughout the eight-hour workday without frequent redirection to task; no sudden or unpredictable workplace changes in terms of use of work tools, work processes, or work settings and if there are workplace changes, they are introduced gradually; cannot perform tasks requiring intense focused attention for more than two hours continuously, but can maintain attention concentration for two hour segments of time; work that does not require satisfaction of strict or rigid production quotas or does not involve assembly line pace work; only brief and superficial interactions with supervisors, co-workers, and the general public, defined as occasional and casual contact with no prolonged conversations and contact with supervisors is short but allows the supervisors to give instructions; and no exposure to intense or critical supervision.

[Filing No. 7-25, at ECF p. 27-28]

Accordingly, having found no credible issue raised by Plaintiff concerning the ALJ's assessment of Plaintiff's mental RFC that warrants remand, the ALJ's mental RFC finding is affirmed.

### E.  Training Period

Plaintiff asserts that it was harmful error for the ALJ to conclude that Plaintiff could perform the occupations cited by the VE based on the VE's testimony that the training period of those occupations may require more than superficial contact with supervisors.  [Filing No. 11, at ECF p. 34.]  However, the Court finds the ALJ's conclusion to be supported by substantial evidence.

During the hearing, Plaintiff's representative asked the VE, "during the training period for these unskilled positions, is there times when more than just superficial contact with the supervisors would be required in order to run the task?"  [Filing No. 7-26, at ECF p. 55.]  The VE responded:

> Yes, there would be.  You know, there is a training period.  You know, everybody is a little bit different.  It could be a short demonstration up to 30 days, it just depends on how long it takes the person learns the unskilled occupation.  If it takes longer, than that would be more than superficial.  If it doesn't, then it's not really any more than that.

[Filing No. 7-26, at ECF p. 55.]  Plaintiff's representative clarified, "So, it is possible then that in order to learn the job more than superficial contact would be required?"  [Filing No. 7-26, at ECF p. 55.]  The VE testified, "For some people, I'm not going to say for all of them.  It just depends on the person."  [Filing No. 7-26, at ECF p. 55-56.]

The ALJ revisited the issue later in the hearing, asking the VE, "Let's go back to that first question Ms. Redelman had.  Basically, would this be a sustained period of time in training or pretty short-term training?"  [Filing No. 7-26, at ECF p. 56.]  The VE responded:

> Again, Judge, it just kind of depends on the person.  Generally, you know, for unskilled work, it's a short demonstration.  And the supervisor would come back and check on them.  But everybody is different, and I can't say it's going to be normal for everybody.  Some people may take longer than others.

[Filing No. 7-26, at ECF p. 56.]  The VE added, "And I'll say if a person -- based on my experience, if a person needed ongoing supervision, that generally would be more of a supportive employment program than an accommodation."  [Filing No. 7-26, at ECF p. 57.]

There is no credible evidence that Plaintiff would need additional supervision to learn the simple tasks commensurate with his RFC to perform the other work occupations cited by the VE. The VE's testimony made clear that the jobs do not vary as to whether they require more than superficial contact with supervisors.  Rather, the individuals performing the jobs vary as to whether they may need additional supervision to learn the required job tasks.  As noted above, Plaintiff is a highly intelligent and well-educated individual with a master's degree.  His supervisor indicated that he had no issues with understanding and carrying out short and simple instructions or accepting instructions from supervisors.  Likewise, Dr. Johnson assessed Plaintiff to have no significant limitations in the relevant areas of functioning.  As such, it was reasonable for the ALJ to conclude that Plaintiff would not potentially need increased supervision during the training period.

### F.  Listing 1.04

Plaintiff contends that the ALJ did not properly evaluate whether the record demonstrated that Plaintiff's impairments met or medically equaled Listing 1.04 because the ALJ incorrectly determined that diagnostic imaging of his lumbar spine did not meet the criteria of the listing. [Filing No. 11, at ECF p. 34-35.]

To meet an impairment identified in the listings, a claimant must establish, with objective medical evidence, the precise criteria specified in the listing.  *See* 20 C.F.R. § 404.1525; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award of" benefits at Step Three).  In the alternative, a claimant can establish "medical equivalence" in the absence of one or more of the findings if she has other findings related to the impairment or has a combination of impairments that "are at least of equal medical significance."  *See* 20 C.F.R. § 404.1526(a)-(b).  In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing.  *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2003).  For example, in *Minnick v. Colvin,* 775 F.3d 929, 935-36 (7th Cir. 2015), the Seventh Circuit found the ALJ's perfunctory analysis to warrant remand when it was coupled with significant evidence of record that arguably supported the listing.  *See Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012) (remanding where the ALJ's cursory listing analysis failed to articulate a rationale for denying benefits when the record supported finding in the claimant's favor).  To demonstrate that an ALJ's listing conclusion was not supported by substantial evidence, the claimant must identify evidence of record that was

misstated or ignored which met or equaled the criteria.  *See*, *e.g.*, *Sims v. Barnhart*, 309 F.3d 424, 429-30 (7th Cir. 2002).

The regulations provide examples of medical impairments that satisfy the diagnostic criteria of Listing "1.04 *Disorders of the Spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 1.04.  To establish Listing 1.04(A), the regulations require:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

*Id*. at 1.04(A).

The ALJ's listing discussion explained only that "Listing 1.04 requires a disorder of the spine, resulting in compromise of a nerve root or the spinal cord with either evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. Imaging studies do not satisfy these criteria, as discussed in detail below."  [Filing No. 7-25, at ECF p. 11 (citations omitted).]

However, as to the one requirement that the ALJ addressed, his assessment was incorrect that imaging studies did not meet the diagnostic criteria.  An MRI of Plaintiff's lumbar spine, taken September 8, 2016, revealed at "L4-5, there is moderate bilateral subarticular zone stenosis with compression of the bilateral traversing L5 nerve roots in the lateral recesses."  [Filing No. 7-42, at ECF p. 35.]  Because the ALJ incorrectly determined that the diagnostic criterion for Listing 1.04(A) was not met, the ALJ did not analyze the remaining requirements of the listing in

the written decision.  As such, the Court is not able to conclude that the ALJ adequately

considered whether the requirements were precisely met or medically equaled.

The record does contain evidence that met, with one exception, the remaining

requirements of Listing 1.04(A).  A specialist that Plaintiff was referred to for his spine disorders

commented that his leg pain may be the result of "peripheral neuropathy, though bilateral L5

lumbar radiculopathies are also likely contributing."  [Filing No. 7-33, at ECF p. 33.]  Along

with Plaintiff's 2017 applications, the SSA noted that the updated imaging established a

medically determinable impairment for his chronic back pain.  However, the ALJ stated that an

updated consultative examination was needed because recent pain management notes failed to

address his gait, range of motion, or any other findings related to his impairment since the

October 2016 examination in connection with the spine consultation.  [Filing No. 7-27, at ECF p.

61.]  The January 2018 consultative examination revealed that Plaintiff had decreased range of

motion in the lumbar spine with decreased muscle strength at 3/5 in the bilateral lower

extremities.  [Filing No. 7-40, at ECF p. 42-43.]  Compounding matters, the ALJ summarized the

consultative examination, noting that "[s]traight leg raise yielded negative results bilaterally."

[Filing No. 7-25, at ECF p. 16.]  However, the examination actually noted that a straight leg

raising test was positive on the left in the supine position.  [Filing No. 7-40, at ECF p. 43.]  The

listing requires that there be a positive straight leg raising test in both the sitting and supine

position.  There is no indication that there was a positive test in the sitting position.  However, it

should be noted that despite being ordered to evaluate Plaintiff's spine impairment, there is also

no indication that the required test was performed by the consultative examiner.  Moreover, the

remaining alternative requirements that there be decreased reflexes or sensation were both met in

one of the most recent examinations of record.  [Filing No. 7-43, at ECF p. 3 (decreased deep

tendon reflexes in the bilateral lower extremities and decreased sensation to light touch and pinprick in the left lower extremity).]

The ALJ's perfunctory analysis of Listing 1.04(A) combined with significant evidence of record relevant to an evaluation of the listing requires remand for further consideration.  While the evidence did not precisely meet the listing requirements, Plaintiff has also been diagnosed with peripheral polyneuropathy either caused by HIV or related anti-retroviral treatment.  [Filing No. 7-15, at ECF p. 48.]  An EMG/nerve conduction study revealed chronic axonal neuropathy predominantly affecting the lower extremities.  [Filing No. 7-15, at ECF p. 68.]  As noted by an examining specialist, the symptoms and functional effects of the two impairments are similar enough that they are difficult to distinguish.  Further consideration as to whether Plaintiff's combined impairments medically equal a listing is needed on remand.

### G.  Standing and Walking

Plaintiff also contends that substantial evidence does not support the ALJ's conclusion that Plaintiff would be capable of standing and walking commensurate with light exertion work.  [Filing No. 11, at ECF p. 33.]

As noted above, the ALJ found that Plaintiff was capable of performing the exertional requirements of light work as defined in the regulations.  The regulatory definition is as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).  Agency guidance adds that:

> "Frequent" means occurring from one-third to two-thirds of the time.  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a

workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time.

SSR 83-10 (S.S.A. 1983), 1983 WL 31251, at *6.

Plaintiff asserts that evidence showing decreased muscle strength and sensation in his lower extremities, as well as reported issues with falling, would preclude his ability to stand and walk for approximately two-thirds of an eight-hour day. [Filing No. 11, at ECF p. 33.]

Plaintiff presents a close issue. On the one hand, the ALJ gave significant weight to the most recent reviewing consultant's assessment. [Filing No. 7-25, at ECF p. 22.] The consultant reviewed the updated evidence including the consultative examination ordered at the request of the SSA revealing decreased muscle strength in the lower extremities and the lumbar MRI showing nerve root compression. [Filing No. 7-27, at ECF p. 61.] The reviewing consultant assessed that Plaintiff would be capable of standing and/or walking for about six hours with normal breaks in an eight-hour day. [Filing No. 7-27, at ECF p. 60.] There is no medical source statement of record that indicates that Plaintiff has been assessed to be more limited in his capacity to stand or walk. The Seventh Circuit has held that "[w]hen no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error." *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) (citing *Rice*, 384 F.3d at 370).

On the other hand, the ALJ did not address evidence that a treating neurologist seeing Plaintiff for his peripheral neuropathy found him to have a positive Romberg sign for unsteadiness on examination and advised him to concentrate on fall prevention. [Filing No. 7-40, at ECF p. 14.] The ALJ also summarized updated treatment with a neurologist after the last expert review as indicating marked improvement with Plaintiff's neurological symptoms, as well as "no reports of back or neck difficulties." [Filing No. 7-25, at ECF p. 16.] In June 2018,

Plaintiff was referred to neurology for his neuropathy and he did report at his initial visit with the new provider that a transition to Lyrica had resulted in marked improvement of his neurological symptoms. [Filing No. 7-42, at ECF p. 4.] However, the specialist assessed "based on his exam findings, he does certainly have neuropathy and it likely has progressed and worsened due to the fact that his entire left leg is involved and he is now having difficulty with walking." [Filing No. 7-42, at ECF p. 5.] The ALJ also did not confront that the provider advised Plaintiff that he was on the maximum dosage of Lyrica but that Amitriptyline could be increased for neuropathic pain at the risk of side effects exasperating his bipolar disorder and causing hallucinations. [Filing No. 7-42, at ECF p. 6.] Despite the risks, on September 20, 2018, Plaintiff's neurologist prescribed an increased dosage of Amitriptyline at Plaintiff's request for ongoing pain. [Filing No. 7-43, at ECF p. 4.]

In light of the Court's decision to remand the case for further consideration of the listings, additional consideration of Plaintiff's physical RFC—including his ability to stand and walk—would be prudent on remand.

## IV.    Conclusion

Plaintiff presents no legal basis to reverse the ALJ's decision that he was not disabled from a mental standpoint during the relevant period. Accordingly, the ALJ's decision is **AFFIRMED IN PART**, as it pertains to Plaintiff's mental RFC. However, for the reasons explained above, the ALJ's decision is **REMANDED IN PART**, for further consideration of Listing 1.04(A) and possible medical equaling of the listings. Final judgment will issue accordingly.

Date: 4/21/2020    _____

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

26

Distribution: All ECF-registered counsel of record by email.